Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/30/2024 09:11 AM CDT

State of Nebraska, appellee, v.
Gregory Moore, appellant.
___ N.W.3d ___

Filed August 30, 2024.    No. S-23-630.

1. **Rules of Evidence: Other Acts.** Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court.

2. **____: ____.** An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of evidence of other crimes, wrongs, or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022).

3. **Trial: Rules of Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.

4. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

5. **Rules of Evidence: Other Acts.** Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), is a rule of inclusion, rather than exclusion; it permits evidence of other crimes, wrongs, or acts to be admissible for all purposes except to prove the character of a person in order to show that such person acted in conformity with that character.

6. **Rules of Evidence: Other Acts: Words and Phrases.** Evidence that is offered for a proper purpose under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), is often referred to as having "special" or "independent" relevance, which means its relevance does not depend upon its tendency to show propensity.

7. **Criminal Law: Rules of Evidence: Other Acts: Proof.** Under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), proof of another distinct substantive act is admissible in a criminal prosecution when there is some legal connection between the two upon which

it can be said that one tends to establish the other or some essential fact in issue.

8. **Evidence: Other Acts.** Evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.

9. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court's analysis under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), generally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

10. **Rules of Evidence: Other Acts.** The admissibility of prior bad act evidence under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), must be determined upon the facts of each case and is within the discretion of the trial court.

11. **Criminal Law: Words and Phrases.** "Motive" is generally defined as that which leads or tempts the mind to indulge in a criminal act.

12. **Criminal Law: Intent: Proof.** Even when motive is not an element of the charged crime, courts have recognized it is nevertheless relevant to the State's proof of the intent element of the crime. Thus, motive qualifies as a legitimate noncharacter theory because although character carries a connotation of an enduring general propensity, motive is a situationally specific emotion.

13. **Rules of Evidence: Other Acts: Proof.** There is sometimes a fine line between prior bad act evidence that goes only to the character or propensity of an actor and prior bad act evidence that speaks to the actor's motive to commit a later crime. But evidence is not barred by Neb. Evid. R. 404(2), Neb. Rev. Stat § 27-404(2) (Cum. Supp. 2022), just because its relevance could be characterized in terms of propensity. Where the defendant's motive is particular—in other words, is not based in the defendant's character—evidence of prior acts is nonetheless admissible to show the defendant's motive to commit the charged crime.

14. **Intent: Words and Phrases.** Intent is generally defined as the state of mind accompanying an act.

15. **Criminal Law: Other Acts: Intent: Proof.** Where the intent of the defendant is a matter in issue, it is generally allowable in criminal cases to introduce evidence of other acts of a kindred character to establish a defendant's intent or motive in the particular case.

16. **Intent: Words and Phrases.** "Intentionally" means willfully or purposely, and not accidentally or involuntarily.

17. **Criminal Law: Words and Phrases.** The meaning of "knowledge" in a criminal action can vary with the context in which it is used, but it commonly imports a perception of facts requisite to make up a crime. Knowledge, like intent, may be inferred from the circumstances surrounding the act.

18. **Rules of Evidence.** For purposes of Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), analysis, absence of mistake or accident is normally not at issue unless the defendant claims that his or her conduct in committing the charged crime was an accident or mistake, or the defendant's act could be criminal or innocent depending on the defendant's state of mind.

19. ____. Evidence that is admissible under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), may nevertheless be excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), if its probative value is substantially outweighed by the danger of unfair prejudice.

20. **Evidence: Words and Phrases.** The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.

21. **Evidence: Other Acts.** Generally, prior bad act evidence has probative value when it is related in time, place, and/or circumstances to the offense or offenses charged.

22. **Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

23. **Rules of Evidence.** The fact that evidence is prejudicial is not enough to require exclusion under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under rule 403.

24. **Evidence: Words and Phrases.** Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from the proof specific to the offense charged, commonly on an emotional basis.

Appeal from the District Court for Scotts Bluff County, ANDREA D. MILLER, Judge. Affirmed.

Timothy S. Noerrlinger and Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

After a jury found Gregory Moore guilty of second degree murder and use of a weapon to commit a felony, he was sentenced to consecutive terms of imprisonment. In this direct appeal, Moore argues the district court erred by admitting evidence of a prior assault under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022). We find no abuse of discretion in the admission of this evidence and therefore affirm the judgment of the district court.

## I. FACTS

### 1. Background

In November 2020, Moore lived on the second floor of an apartment building in Scottsbluff, Nebraska. The apartment building was operated by a rehabilitation program, and access to the second floor required a special access key. Visitors could ring a doorbell to let second-floor residents know they were there, and the resident would then go to the access door to admit them.

On November 25, 2020, a tenant who lived in a first-floor apartment of the building was awakened at 4 a.m. by noise coming from Moore's second-floor apartment. The tenant heard "scuffling and rumbling around" in Moore's apartment and then heard a man's voice "crying or just yelling 'Stop, stop, don't do that.'" He testified the voice was "pretty loud" and that it was not Moore speaking. The tenant did not contact law enforcement at the time, but he reported the disturbance to the apartment building manager later that morning. The tenant also reported that Moore had been yelling out his apartment window.

The manager went to the apartment building, stood below Moore's window, and spoke with Moore for several minutes. Moore told the manager he was out of his medication and said he "[didn't] want anybody in [his] apartment" and "he didn't like people pointing guns at him." He also said that "he had the inventory there." When the manager asked Moore whether he was alone in the apartment, Moore did not answer and walked away from the window. The manager then called Moore's caseworker to report that Moore was out of his medication and called the police to request a welfare check.

Shortly thereafter, a Scottsbluff police officer arrived at Moore's apartment. The officer's interaction with Moore was recorded on the officer's body camera, and that video was introduced into evidence at trial. Moore had blood on his body and his clothing, injuries to his abdomen and back, and a deep laceration on the webbing of his right hand between his thumb and forefinger. The inside of Moore's apartment was in disarray, with the furniture overturned. There was a significant amount of blood on the walls and the area near the front door, as well as several large pools of blood on the floor. The body of 23-year-old Fernando Camacho-McBride was lying face down on the living room floor, near a bloody, orange kitchen knife.

When the officer said to Moore, "You've got some blood on you," Moore responded, "Yeah, illegal entry here . . . somebody illegal entry." Moore also mentioned something about "lookin' my inventory over," and he told the officer, while gesturing toward his apartment, "this inventory is all paid for. All the inventory is paid for." Moore also told the officer, "I don't like illegal entry" and "I need my medicine." The officer testified that when he called his sergeant to report, "I have a murder," Moore was standing nearby and said, "Yeah," and gave a "two thumbs up" gesture.

Camacho-McBride was related to a previous tenant of the apartment building who had recently moved out but still had an access key. Camacho-McBride had visited that relative

on several prior occasions without authorization, and the manager had banned Camacho-McBride from the apartment building. There was no sign of forced entry into Moore's apartment and no direct evidence of how Camacho-McBride came to be inside Moore's apartment. Two witnesses testified that Moore would sometimes let them stay in his apartment when they needed a safe place to sleep, and one of those witnesses testified that she left some things in Moore's apartment after such a stay, including an orange kitchen knife.

An autopsy revealed that Camacho-McBride bled to death from a stab wound through his left upper arm that was approximately 5 inches deep and had severed an artery. Camacho-McBride also had injuries to his fingers and hand that were consistent with defensive wounds and had bruising to his face that was consistent with blunt force trauma. During the autopsy, the medical examiner recovered the broken tip of a knife blade from a stab wound on the victim's skull. The recovered knife tip appeared to match the orange kitchen knife found in Moore's apartment.

A toxicology report conducted on Camacho-McBride showed he had amphetamine, THC, and 700 nanograms of methamphetamine in his system at the time of his death. A witness testified that persons with over 200 nanograms of methamphetamine in their system "ha[ve] been reported" to exhibit violent and irrational behavior. No guns or drugs were found in Moore's apartment.

## 2. Procedural History

In December 2020, the State charged Moore with second degree murder and use of a deadly weapon other than a firearm to commit a felony in violation of Neb. Rev. Stat. §§ 28-304 and 28-1205(1)(b) (Reissue 2016). Moore entered pleas of not guilty.

### (a) Rule 404 Motions

Pretrial, Moore filed a motion in limine seeking to exclude evidence of a March 2020 assault on his former landlord,

which also involved a knife. Moore argued the only purpose of such evidence was to show his propensity for violence, and he argued the admission of such evidence would violate Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), and rule 404(1). The State filed a pretrial motion seeking to introduce evidence of the same prior assault pursuant to rule 404(2). The record suggests that Moore intended to claim there was a sudden quarrel and he was acting in self-defense, and the State argued that evidence of the March 2020 assault was independently relevant to show Moore's intent, motive, knowledge, and absence of mistake or accident regarding the charged offenses.

At the evidentiary hearing on these competing rule 404 motions, the State offered evidence relating to the events of November 25, 2020, as described above. Additionally, the State offered the following testimony about the March 2020 assault.

### (b) March 2020 Assault

The victim of the March 2020 assault was Moore's former landlord, who testified that he and Moore had been friends for about 30 years. At the time of the assault, Moore was renting a house from the landlord and had asked the landlord to come over to fix a problem with a drain. When the landlord arrived, Moore was standing outside, pacing. The landlord asked, "'What's wrong with your drain?'" but Moore kept pacing and "going on about the neighbor." When the landlord suggested they go inside the house to look at the drain, Moore "jumped" him without provocation and began beating him. During the assault, Moore pulled out a knife, which the landlord kicked away. The landlord eventually got away and contacted law enforcement.

One of the officers who responded to the March 2020 assault testified that when he arrived on scene and asked Moore what had happened, Moore kept repeating, "'You need to arrest [the landlord]. I was just protecting my inventory.'" The officer asked Moore what he meant by "inventory," but

Moore said the officer "didn't need to know that." When Moore was taken into custody, he advised police that he was carrying a knife and "would use it to defend himself and his property."

### (c) Rule 404 Ruling

In a written order, the trial court sustained the State's motion to introduce evidence of the March 2020 assault for a limited purpose and overruled Moore's motion in limine. The court noted that the charged offenses and the prior assault occurred within months of each other, that both involved knife attacks, and that Moore made similar comments to police after both incidents in which he blamed the victims and said he was just protecting his "inventory." Based on these similarities, the court concluded that evidence of the March 2020 assault was independently relevant and admissible for the limited purposes of proving Moore's motive, intent, knowledge, and absence of mistake or accident regarding the charged offenses. The court's order also expressly found that the probative value of the evidence did not outweigh the danger of unfair prejudice. The order stated that an appropriate limiting instruction would be given at trial, and it emphasized that the ruling was preliminary in nature and the parties could raise the matter again at trial if they deemed it appropriate.

### 3. Jury Trial

The matter proceeded to a jury trial. Sixteen witnesses testified over the course of 4 days, and multiple exhibits were received. Moore did not testify.

When the State presented evidence about the prior assault in March 2020, Moore renewed his rule 403 and rule 404 objections. The court overruled those objections but gave a limiting instruction, advising the jury that the evidence was being admitted "for a limited purpose to help you decide whether [Moore] had the intent, motive, knowledge, and absence of mistake or accident for the crime charged on November 25, 2020. You should consider that evidence for

these limited purposes only." No party objected to the limiting instruction, and no alternative instruction was requested.

In addition to the evidence already described, Camacho-McBride's girlfriend testified that if he was drinking, she did not allow him to come to her home because she did not want him around her children while intoxicated. Similarly, Camacho-McBride's father testified that he did not allow Camacho-McBride to stay at his house while intoxicated. The father testified that Camacho-McBride had recently been abusing alcohol and methamphetamine, and the father assumed Camacho-McBride would look for a place to stay for the night if he was intoxicated. The father also testified that Camacho-McBride was a "big boy" who had been in several fights and knew how to defend himself, if provoked. Other trial evidence established that Camacho-McBride was 5 foot 11 inches tall and weighed 238 pounds, while Moore was approximately 6 foot 2 inches tall and weighed 300 pounds.

### (a) Jury Instructions

Regarding the charge of second degree murder, the jury was instructed that the State had the burden to prove each of the following elements beyond a reasonable doubt:

  1. That [Moore] killed [Camacho-McBride]; and

  2. That [Moore] did so intentionally, but without premeditation; and

  3. That [Moore] did so without the provocation of a sudden quarrel; and

  4. That [Moore] was not acting in self-defense; and

  5. That [Moore] did so on or about November 25, 2020, in Scotts Bluff County, Nebraska.

The jury was also instructed on the lesser-included offense of manslaughter. The instructions defined "intentionally" to mean "willfully or purposefully, and not accidentally or involuntarily." "Sudden quarrel" was defined as follows:

  **Sudden quarrel** is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self control. It does not necessarily mean an

exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. It is not the provocation alone that reduces the degree of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of first degree or second degree murder are absent. The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment. The test is an objective one. Qualities peculiar to the defendant which render him or her particularly excitable, such as intoxication, are not considered.

And the jury was instructed that Moore acted in self-defense if:

(1) [Camacho-McBride] threatened death or serious bodily harm to [Moore];

(2) [Moore] did not provoke any such use of force against him with the intent of using deadly force in response; and

(3) Under the circumstances as they existed at the time, [Moore] reasonably believed that his use of deadly force was immediately necessary to protect himself against death and/or serious bodily harm.

The fact that [Moore] may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in response to that belief.

There were no objections to any of the above instructions, and no alternative instructions were offered by either party.

### (b) Closing Arguments

In closing, the prosecutor argued that Moore intentionally killed Camacho-McBride and suggested there was no

competent evidence that Moore was provoked, no competent evidence that the killing occurred as the result of a sudden quarrel, and no competent evidence that Moore was acting in self-defense. The State's theory was that Moore let Camacho-McBride into his apartment and, at some point, perceived that Camacho-McBride was "looking at [his] inventory" or "messing with his inventory" and decided to stab and kill Camacho-McBride to "protect [that] inventory." The prosecutor suggested the same motivation—to protect his "inventory"—had prompted Moore to assault his landlord without provocation a few months earlier. The prosecutor argued that whatever Moore meant by "inventory," his motivation to protect it through the use of deadly force was not objectively reasonable and could not support a finding of sudden quarrel or self-defense. The prosecutor thus argued it was "pretty clear" that Moore was the aggressor and that Camacho-McBride was trying to protect himself, pointing to evidence that Camacho-McBride had multiple defensive wounds and that during the commotion, Camacho-McBride was heard screaming "'[s]top, stop.'" And the prosecutor suggested the stab wound to Camacho-McBride's skull likely explained the cut to Moore's right hand when the "knife came to a rapid stop and his hand just went down on the blade." The prosecutor argued there was no evidence that Camacho-McBride entered Moore's apartment illegally, no evidence that Camacho-McBride was armed, and no evidence to justify Moore's use of deadly force. He asked the jury to return verdicts finding Moore guilty of second degree murder and use of a deadly weapon to commit a felony.

Defense counsel, in closing argument, generally agreed that Moore likely let Camacho-McBride into his apartment because he needed a place to stay for the night. Defense counsel suggested the two men eventually engaged in an extended fight that damaged much of Moore's apartment, and it was defense counsel's theory that Camacho-McBride was the aggressor. To support that theory, counsel pointed

to evidence that Camacho-McBride was "not a stranger to a fight" and to evidence that the level of methamphetamine in Camacho-McBride's blood could have made him aggressive. Defense counsel suggested the kitchen knife was already in the room when a sudden quarrel broke out, and the fatal wound occurred during a prolonged struggle over that knife. Defense counsel argued the knife wounds to Camacho-McBride's arm and skull did not indicate an intent to kill, reasoning "there were no wounds to the torso, the usual places where people bury knives in the attempt to kill people." Defense counsel argued, based on the nature of the injuries and evidence of a physical fight that included a "struggle over the knife," that the State had failed to prove the killing was intentional and not accidental. But defense counsel also argued:

> I'm not here to argue that this is a manslaughter. I'm here to argue that [Moore] acted in self-defense, and, yes, it elevated to deadly force after it began in a situation in which he was entitled to protect his property; that there was no reason for a fight to occur in that living room, and that there is evidence that you can find that it was [Camacho-McBride] that provoked the fight and was the first aggressor because that is his history. He's a scrapper. He's a guy that's not afraid of a fight. He's the guy who likes to fight.

Defense counsel asked the jury to return a verdict of not guilty on each count.

After deliberating for approximately 2 hours, the jury found Moore guilty of second degree murder and of use of a weapon to commit a felony. At a later sentencing hearing, the court imposed a prison sentence of 80 years to life on the murder conviction and a consecutive prison sentence of 10 to 20 years on the use conviction. Moore filed this timely appeal, represented by his trial counsel.

## II. ASSIGNMENT OF ERROR

Moore assigns that the district court erred in admitting evidence of the prior assault over his objection.

## III. STANDARD OF REVIEW

[1] Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court.[1]

[2] An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of evidence of other crimes, wrongs, or acts under rule 404(2).[2]

[3] A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.[3]

[4] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[4]

## IV. ANALYSIS

On appeal, Moore argues the district court erred in admitting evidence of the prior March 2020 assault over his objections. He contends this evidence served no proper purpose under rule 404(2) and was "classic" propensity evidence that allowed the jury to infer he is "the type of person who acts with violent intent when he is angry."[5] He also argues that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice.

To address these arguments, we first recall the legal principles that govern the admissibility of prior bad act evidence under rule 404(2). Rule 404(2) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show

---

[1] *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

[2] See *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[3] *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024).

[4] *Id*.

[5] Brief for appellant at 7 (internal quotation marks omitted).

that he or she acted in conformity therewith. It may, how-ever, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[5,6] We have described rule 404(2) as a rule of inclusion, rather than exclusion, holding that it permits evidence of other crimes, wrongs, or acts to be admissible for all purposes except to prove the character of a person in order to show that such person acted in conformity with that character.[6] Evidence that is offered for a proper purpose under rule 404(2) is often referred to as having "special" or "independent" relevance, which means its relevance does not depend upon its tendency to show propensity.[7]

[7,8] Under rule 404(2), proof of another distinct substan-tive act is admissible in a criminal prosecution when there is some legal connection between the two upon which it can be said that one tends to establish the other or some essential fact in issue.[8] In other words, evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.[9]

[9,10] An appellate court's analysis under rule 404(2) gen-erally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially

---

[6] See, *State v. Wheeler*, 314 Neb. 282, 989 N.W.2d 728 (2023); *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

[7] See, *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019); *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016); *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011).

[8] See *Wheeler, supra* note 6.

[9] See *White, supra* note 6.

outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.[10] The admissibility of prior bad act evidence under rule 404(2) must be determined upon the facts of each case and is within the discretion of the trial court.[11]

With these principles and analytical framework in mind, we consider whether evidence of Moore's prior assault on his landlord was relevant for a purpose other than to show that Moore had a propensity for violence.

### 1. Evidence Was Relevant for Purpose Other Than Propensity

Moore was charged with second degree murder and use of a weapon to commit a felony, both of which require intentional conduct.[12] In defending against these charges, Moore argued that he had no intent to kill, that the death occurred during a sudden quarrel, and that he was acting in self-defense.[13] In its rule 404(2) analysis, the trial court determined that evidence of the March 2020 assault was relevant and admissible for the limited purposes of proving Moore's motive, intent, knowledge, and absence of mistake or accident in connection with the charged crimes. The jury was instructed to consider the evidence for those limited purposes only.

[11-13] In our rule 404(2) jurisprudence, we have generally defined "motive" as that which leads or tempts the mind to

---

[10] E.g., *Boswell, supra* note 2.

[11] See *Thomas, supra* note 7.

[12] See §§ 28-304 and 28-1205(1)(b). See, also, *State v. Tucker*, 278 Neb. 935, 774 N.W.2d 753 (2009) (holding that purely unintentional crime cannot form predicate offense for "use of a weapon" conviction; predicate crime must be either specific or general intent crime).

[13] See Neb. Rev. Stat. § 28-1409 (Reissue 2016) (use of deadly force justifiable if actor believes such is necessary to protect self against death or serious bodily harm unless actor provided use of force against actor or actor can safely retreat).

indulge in a criminal act.[14] And even when motive is not an element of the charged crime, we have recognized it is nevertheless relevant to the State's proof of the intent element of the crime.[15] Thus, motive qualifies as a legitimate noncharacter theory because although character carries a connotation of an enduring general propensity, motive is a situationally specific emotion.[16] We have recognized there is sometimes a fine line between prior bad act evidence that goes only to the character or propensity of an actor and prior bad act evidence that speaks to the actor's motive to commit a later crime.[17] But evidence is not barred by rule 404(2) just because its relevance could be characterized in terms of propensity.[18] Where the defendant's motive is "particular—in other words, is not based in the defendant's character—evidence of prior acts is nonetheless admissible to show the defendant's motive to commit the charged crime."[19]

[14-16] Intent is generally defined as "'[t]he state of mind accompanying an act.'"[20] And where the intent of the defendant is a matter in issue, it is generally allowable in criminal cases to introduce evidence of other acts of a kindred character to establish a defendant's intent or motive in the particular case.[21] And, as the jury was instructed here, "intentionally" means willfully or purposely, and not accidentally or involuntarily.[22]

---

[14] See, *Boswell, supra* note 2; *Thomas, supra* note 7.

[15] See *id.*

[16] See *id.*

[17] See *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[18] *Id.*

[19] *Id*. at 159-60, 812 N.W.2d at 233.

[20] *Id*. at 157, 812 N.W.2d at 231.

[21] See *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[22] *State v. Woolridge-Jones*, 316 Neb. 500, 516, 5 N.W.3d 426, 437 (2024).

[17] The meaning of "knowledge" in a criminal action can vary with the context in which it is used,[23] but it commonly "imports a perception of facts requisite to make up [a] crime."[24] Knowledge, like intent, may be inferred from the circumstances surrounding the act.[25]

[18] For purposes of rule 404(2) analysis, absence of mistake or accident is normally not at issue unless the defendant claims that his or her conduct in committing the charged crime was an accident or mistake, or the defendant's act could be criminal or innocent depending on the defendant's state of mind.[26]

To determine whether the State met its burden of proving the material elements of second degree murder in this case, the jury had to decide, among other things, whether the killing was intentional or accidental, whether the killing was with or without provocation, whether there was or was not a sudden quarrel, and whether Moore was the aggressor or was acting in self-defense. Given these material issues, we agree with the district court that evidence of the circumstances surrounding the March 2020 assault, and, in particular, Moore's comments to police about what motivated his conduct, was relevant for a purpose other than propensity.

The March 2020 assault and the assault that resulted in Camacho-McBride's death occurred within approximately 8 months of one another, both assaults involved a knife, and after both assaults, Moore explained his conduct to police by blaming the victims and referencing the "inventory" inside his residence. After the March 2020 assault, Moore said, "'You need to arrest [the landlord]. I was just protecting my

---

[23] See *R. D. Lowrance, Inc. v. Peterson*, 185 Neb. 679, 178 N.W.2d 277 (1970).

[24] *Id*. at 682, 178 N.W.2d at 279.

[25] *State v. Mills*, 199 Neb. 295, 258 N.W.2d 628 (1977). Accord *Almasaudi, supra* note 7.

[26] See *Almasaudi, supra* note 7.

inventory.'" Similarly, after the assault that killed Camacho-McBride, Moore told police there was an "illegal entry" and someone was "lookin' my inventory over," adding, while gesturing toward his apartment, "this inventory is all paid for. All the inventory is paid for."

Although there is scant evidence about what Moore means when he refers to his "inventory" or why he is willing to use a deadly weapon to protect it when he knows people are coming into his home, evidence of Moore's similar comments to police after both assaults tends to suggest that his motivation in both attacks was to protect his "inventory." This particular motivation is not based on Moore's character, and it is relevant to deciding whether the killing of Camacho-McBride was intentional or accidental. Moreover, evidence that the March 2020 assault occurred suddenly and without provocation when the victim suggested they go inside the house is relevant to whether the stabbing of Camacho-McBride inside Moore's apartment occurred with or without provocation, whether there was or was not a sudden quarrel, and whether Moore was the aggressor or was acting in self-defense.[27]

In *State v. Stewart*,[28] we held that evidence of the defendant's prior use of a knife during an altercation was admitted for the proper purpose of negating his assertion that the victim accidentally came into contact with the knife used in the charged crime. Similarly, evidence that Moore attacked his landlord with a knife without any provocation 8 months before the charged offense and evidence that he told officers at the time he would use a knife to protect his inventory tended to negate Moore's assertion that the fatal knife injuries inflicted on Camacho-McBride occurred accidentally.

---

[27] See, e.g., *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997) (finding no abuse of discretion in admitting evidence of prior attempted sexual assault that was factually similar to charged crime for limited purpose of proving plan, knowledge, and identity).

[28] *State v. Stewart*, 219 Neb. 347, 363 N.W.2d 368 (1985).

At trial, Moore argued not just that he lacked the requisite intent to kill, but also that he was acting in self-defense so that his actions were justified. The Eighth Circuit has held that evidence of a prior bad act is admissible for a proper purpose if it rebuts a claim of self-defense by showing the absence of a mistake or accident.[29] Similarly, the rule in Nebraska is that evidence of other crimes, wrongs, or acts may be used to establish that the defendant's actions were accompanied by criminal intent and to refute an accused's claim of self-defense.[30]

On this record, we conclude that evidence of the March 2020 assault was not offered solely to demonstrate Moore's character or propensity for violence, but, rather, was offered for the proper purposes of showing Moore's motive, intent, knowledge, and absence of mistake or accident regarding the charged crimes. There was no abuse of discretion in the district court's decision to admit this evidence for those limited purposes.

### 2. Probative Value Versus Unfair Prejudice

[19-21] Evidence that is admissible under rule 404(2) may nevertheless be excluded under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice.[31] The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.[32] Generally, prior bad act evidence has probative value when it is related in

---

[29] See, *U.S. v. Steele*, 550 F.3d 693 (8th Cir. 2008); *U.S. v. Haukaas*, 172 F.3d 542 (8th Cir. 1999).

[30] See *Stewart, supra* note 28.

[31] *Boswell, supra* note 2. See, *Matteson, supra* note 1; *Stewart, supra* note 28.

[32] *Boswell, supra* note 2; *Thomas, supra* note 7.

time, place, and/or circumstances to the offense or offenses charged.[33]

[22-24] Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[34] The fact that evidence is prejudicial is not enough to require exclusion under rule 403 because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under rule 403.[35] In other words, unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from the proof specific to the offense charged, commonly on an emotional basis.[36]

On this record, we see no abuse of discretion in the trial court's determination that the probative value of the March 2020 assault was high and was not substantially outweighed by the danger of unfair prejudice, particularly in light of the limiting instruction that accompanied the admission of such evidence. When referencing evidence of the March 2020 assault at trial, the State limited its argument to those limited purposes, and we see nothing in the record suggesting such evidence had an undue tendency to suggest a decision on an improper basis.

## V. CONCLUSION

For the foregoing reasons, we find no abuse of discretion in the district court's decision to admit evidence of the March 2020 assault for the proper purposes of showing Moore's motive, intent, knowledge, and absence of mistake or accident

---

[33] See *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

[34] *Boswell, supra* note 2; *Thomas, supra* note 7.

[35] *Boswell, supra* note 2. See *Thomas, supra* note 7.

[36] *Oldson, supra* note 7.

regarding the charged crimes. The evidence was admissible for each of those limited purposes, and its probative value was not substantially outweighed by the danger of undue prejudice, especially given the proper limiting instruction. We therefore reject Moore's assigned error and affirm his convictions and sentences.

Affirmed.